549 So.2d 1250 (1989)
Sandra GUILBEAU, et al., Plaintiffs-Appellees,
v.
SHELTER MUTUAL INSURANCE CO., Defendants-Appellants.
No. 88-640.
Court of Appeal of Louisiana, Third Circuit.
October 4, 1989.
*1251 Morrow, Morrow, Ryan & Bassett, James Ryan, Opelousas, for Guilbeau.
Caffery, Oubre, Dugas & Campbell, Lewis H. Pitman, New Iberia, for Farm Bureau.
Roy & Hattan, L. Lane Roy, Lafayette, for Gaubert.
Fritchie, Cochran, Caire & Coady, Martin E. Coady, Slidell, for Pooler.
Gachassin, Hunter & Sigur, Nicholas Gachassin, Jr., Lafayette, for Dupree.
Juneau, Hill, Judice & Adley, Kathleen Drew, Lafayette, for Shelter.
Martin, Taulbee, Rowe, Bares & Oliver, Howard W. Martin, Lafayette, for Allstate.
Caffery, Oubre, Dugas & Campbell, Michael W. Campbell, New Iberia, for Succession.
F. Ray Mouton/A.I. Stacey Williams, Lafayette, for Gist.
Roy, Forrest & Lopresto, Ltd., L. Albert Forrest, New Iberia, for State Farm.
Michael S. O'Brien, Lafayette, for Standard Fire Ins.
Before STOKER, DOUCET, and YELVERTON, JJ.
DOUCET, Judge.
The above numbered and entitled appeal was consolidated with five other appeals entitled as follows: Dupree v. Estate of Delcambre 549 So.2d 1257 (La.App. 3rd Cir.1989); Louisiana Farm Bureau Mutual Ins. Co. v. Guilbeau, 549 So.2d 1257 (La. App. 3rd Cir.1989); Gaubert v. Estate of Legnon, 549 So.2d 1258 (La.App. 3rd Cir. 1989); Gist v. Farm Bureau Ins. Co., 549 So.2d 1258 (La.App. 3rd Cir.1989); and Pooler, v. Estate of Legnon, 549 So.2d 1259 (La.App. 3rd Cir.1989). We decide all issues presented in all appeals in this opinion, but render separate decrees in the companion appeals.

FACTS
The above consolidated lawsuits arise out of a two-car accident which occurred on August 16, 1985 on Louisiana Highway 182, approximately three miles west of New Iberia, Louisiana. The accident occurred when a vehicle owned and operated by Tammy Ann Legnon Delcambre and traveling in an easterly direction swerved into the westbound lane, striking an oncoming vehicle which was leased by Carroll E. Pooler, Jr. and was being driven by James M. Gist, Jr. Passengers in the Pooler vehicle at the time of the accident were Barbara Pooler, Jennifer Benton, Mary Guilbeau, and Clifford Gaubert, Jr. All of the occupants of the Pooler vehicle were injured in the accident and the aforementioned lawsuits were filed on their behalf. Tammy Delcambre died as a result of injuries she received in the accident.
At the time of the accident, Louisiana Farm Bureau Mutual Insurance Company had in effect a policy of automobile liability insurance covering Tammy Delcambre and her vehicle with limits of $10,000 for liability for personal injuries to any one person and $20,000 for all liability for personal injuries arising out of any one accident. Farm Bureau filed a Petition for Concursus in the trial court and deposited those limits into the registry of the court, disclaiming any liability on the part of its insured.
The Pooler vehicle was insured at the time of the accident by Shelter Mutual Insurance Company (Shelter), defendant, which had in effect a policy of automobile liability insurance with bodily injury limits of $250,000 per person and $500,000 per accident and with uninsured motorist coverage *1252 with stated limits of $50,000 per person and $100,000 per accident. These uninsured motorist limits have been distributed by Shelter to all the plaintiffs who were occupants of the Pooler vehicle. Additionally, Standard Fire Insurance Company (Standard), defendant, had in effect an excess umbrella policy covering the Pooler vehicle which provided liability limits of $1,000,000.00 and also provided uninsured motorist coverage. Also, each occupant of the Pooler vehicle except Barbara Pooler had additional uninsured motorist coverage.
Mr. Pooler had obtained the Shelter policy in June of 1983 through Ricky Couvillion, who is an agent for Shelter. The policy originally provided bodily injury coverage with limits of $100,000.00 per person and $300,000.00 per accident, as well as uninsured motorist coverage with stated limits of $50,000.00 per person and $100,000.00 per accident. Mr. Couvillion first became acquainted with Mr. Pooler when Mr. Pooler contacted him by phone seeking insurance coverage at a cheaper rate than the coverage he currently had. The initial "Automobile Insurance Application" for the Shelter policy was dated June 1, 1983. With respect to that application, Mr. Pooler testified by way of deposition that he signed the application in blank form and it was later completed by Mr. Couvillion. Mr. Pooler testified that there was never any discussion concerning the selection of uninsured motorist limits lower than bodily injury limits and that he never selected such lower limits.
Mr. Couvillion testified at trial and by way of deposition. He testified that he met with Mr. Pooler at Mr. Pooler's office and that he discussed the entire application with Mr. Pooler, simultaneously writing in Mr. Pooler's responses to all the questions on the application. He stated that after this discussion Mr. Pooler signed the application. The sixth question on the application form reads: "Do you want Uninsured Motorist coverage?" Mr. Couvillion recorded Mr. Pooler's response to this question as "Yes." The seventh question on the application form reads: "Do you want Uninsured Motorist limits equal to Bodily Injury Limits?" Mr. Couvillion recorded Mr. Pooler's response to the question as "No." There was no question on the application form asking what lower limits of uninsured motorist coverage the applicant wanted. Mr. Couvillion testified that he discussed the selection of limits of uninsured motorist coverage with Mr. Pooler. Mr. Couvillion wrote in uninsured motorist coverage limits of $50,000/$100,000 in the "Coverages and Ratings" section of the application form. Mr. Couvillion testified that he did not know why he wrote in those limits and did not recall whether he or Mr. Pooler suggested those limits.
After the signing of the application, Shelter issued a policy to Mr. Pooler with stated limits of $100,000/$300,000 for bodily injury coverage and $50,000/ $100,000 for uninsured motorist coverage. Subsequent to the issuance of this policy, Mr. Couvillion was contacted by phone in February of 1985 by Mary Ann Hoffpauir of The Insurance House, an agent of Aetna. This phone call concerned the underlying liability limits necessary to satisfy the requirements of an excess umbrella policy Mr. Pooler was purchasing from Standard. During Mr. Couvillion's testimony, the trial court questioned Mr. Couvillion concerning this phone call and the following exchange took place:
"Q Now, when Mary Ann Hoffpauir called, was it your testimony that she did not, you all did not discuss U.M. coverage at all, or you don't recall one way or the other?
A I can't remember. I distinctly remember that she said that she needed underlying limits of liability and that they needed to be increased to 250/500.
Q And you took that to mean only bodily injury?
A Yes, sir.
Q Not U.M. liability?
A Yes."
Mr. Couvillion testified that after the phone call from Ms. Hoffpauir, he spoke to Mr. Pooler by phone in order to get authorization for the increases in the limits of *1253 the Shelter policy which Ms. Hoffpauir had told him were necessary for the issuance of the excess umbrella policy by Standard. He stated that during this phone call he never discussed uninsured motorist coverage with Mr. Pooler. He testified that Mr. Pooler told him to "give her [Ms. Hoffpauir] whatever she needs." Mr. Couvillion then submitted an application for change to Shelter reflecting an increase in the bodily injury limits of the Shelter policy to $250,000/$500,000, but no increase in the uninsured motorist limits. This requested change was subsequently made by Shelter. The terms of the Standard excess umbrella policy actually required that Mr. Pooler have underlying uninsured motorist limits on the Shelter policy of $250,000/$500,000.
With respect to the change in the limits of the Shelter policy, Mr. Couvillion testified by way of deposition that he did not recall why the limits of the policy were changed. He then stated: "I turned it over to him [Ricky Couvillion] and trusted that the whole thing would be done and that was the end of that."
Because of the complexity of determining the ranking and the extent of coverage of the various insurance policies, all parties agreed to try these issues separately from the issues of liability and damages. The issues to be determined at trial were as follows:
1) The proper ranking of all insurance coverages.
2) Whether a valid selection of uninsured motorist coverage limits lower than bodily injury limits was made by Carroll E. Pooler, Jr. with respect to the policy issued by Shelter.
3) Whether a valid selection of uninsured motorist coverage limits lower than bodily injury limits was made by Carroll E. Pooler, Jr. with respect to the policy issued by Standard.
The trial of these issues was held on November 9, 1987. The evidence introduced into the record at trial consisted of the respective insurance policies and other related documents, the deposition of Carroll E. Pooler, Jr. and others regarding the issuance of insurance policies, and the deposition and testimony of Shelter agent Ricky Couvillion. Additionally, the record was held open for the supplemental deposition of Mr. Pooler, who failed to appear at trial.
On January 22, 1988, the trial court issued its Reasons for Judgment, although no supplemental deposition of Mr. Pooler had been introduced into the record. In those reasons the court found that the Shelter policy and the Standard policy together constituted the primary uninsured motorist coverage for the occupants of the Pooler vehicle. The court also held that, in the event that the limits of these two policies were exhausted, each occupant of the Pooler vehicle was limited to collecting from his own uninsured motorist policy for any damages over and above these limits. The court further found that Mr. Pooler had selected uninsured motorist coverage limits of $250,000/$500,000 under his policy with Shelter, and that he had selected and paid for uninsured motorist umbrella coverage in the amount of $1,000,000 under his policy with Standard. A judgment in accordance with these reasons was signed on February 2, 1988.
Shelter has perfected these appeals, asserting four assignments of error, seeking a reversal of the trial court's finding that Mr. Pooler had selected uninsured motorist coverage under its policy with limits of $250,000/$500,000.
ASSIGNMENT OF ERROR NO. 2
By this assignment of error appellant asserts that the trial court erred in holding that Mr. Pooler selected uninsured motorist coverage limits of $250,000/$500,000 under his policy of insurance with Shelter. Appellant asserts that Mr. Pooler made a valid selection of uninsured motorist limits lower than bodily injury limits on his initial application for insurance with Shelter. Appellant further asserts that the subsequent changes in the Shelter policy did not in any way negate Mr. Pooler's previously valid selection of lower limits of uninsured motorist coverage.
The pertinent statutory provisions regarding uninsured motorist coverage are *1254 found in La.R.S. 22:1406(D)(1)(a), which provides as follows:
"(1)(a) No automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in not less than the limits of bodily injury liability provided by the policy, under provisions filed with and approved by the commissioner of insurance, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured or underinsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; provided however, that the coverage required under this Subsection shall not be applicable where any insured named in the policy shall reject in writing the coverage or selects lower limits. Such coverage need not be provided in or supplemental to a renewal or substitute policy where the named insured has rejected the coverage or selected lower limits in connection with a policy previously issued to him by the same insurer. Any document signed by the named insured or his legal representative which initially rejects such coverage or selects lower limits shall be conclusively presumed to become a part of the policy or contract when issued and delivered, irrespective of whether physically attached thereto."
The basic law is that the limits of the uninsured motorist coverage shall be the same as the limits of bodily injury coverage unless "any insured named in the policy shall reject in writing the coverage or selects lower limits." Further, the insurer carries the burden of proving that any insured named in the policy rejected in writing the coverage equal to bodily injury coverage or selected lower limits. Aramburo v. Travelers Insurance Company, 426 So.2d 260 (La.App. 4th Cir.1983), writ denied, 433 So.2d 161 (La.1983), writ denied, 443 So.2d 1110 (La.1983). The selection of lower uninsured motorist limits requires an affirmative act by the insured and in order for the insured to select different limits, a choice of limits must be made available. Duhe v. Maryland Casualty Company, 434 So.2d 1193 (La.App. 1st Cir. 1983); Aramburo, supra.
The trial court, in its Reasons for Judgment, stated that it found the testimonies of Mr. Pooler and Mr. Couvillion to be "conflicting and ambiguous" as to when and how the selection of uninsured motorist coverage limits was made under the Shelter policy. This is an obvious reference to the selection that was allegedly made on the initial application for insurance with Shelter. The court then stated that it found "the testimony regarding the increase in the levels of coverage to conform to requirements for insurance under the umbrella policy issued by Standard Fire Insurance is dispositive of the matter."
Thus, the trial court made no finding as to whether the alleged selection of lower limits on the initial application for insurance with Shelter was valid and instead based its judgment on the increase in the bodily injury limits of the Shelter policy in February of 1985.
The testimony of Mr. Couvillion was that when he submitted the application for change to Shelter reflecting the increase in the bodily injury limits of the Shelter policy from $100,000/$300,000 to $250,000/$500,000, he did not have Mr. Pooler, in writing, reject uninsured motorist coverage in that amount or select lower limits. In fact, Mr. Couvillion did not even discuss uninsured motorist coverage with Mr. Pooler at that time.
Appellant asserts that Mr. Pooler made a valid selection of uninsured motorist limits of $50,000/$100,000 on the initial application for the Shelter policy in 1983 and that the subsequent increase in bodily injury limits did not in any way negate that previous valid selection. Appellant relies upon La.R.S. 22:1406(D)(1)(a) which reads in pertinent part as follows:
"Such coverage [uninsured motorist coverage in not less than the limits of bodily injury coverage] need not be provided in *1255 or supplemental to a renewal or substitute policy where the named insured has rejected the coverage or selected lower limits in connection with a policy previously issued to him by the same insurer." (Emphasis added.)
In other words, appellant contends that it had no duty to obtain an additional written rejection or selection from Mr. Pooler when the bodily injury limits of the Shelter policy were increased in February of 1985 because such increase constituted a "renewal" or "substitute" policy as contemplated in the above quoted provision. This same contention was rejected in the case of Gilbert v. Waddell, 501 So.2d 330 (La.App. 4th Cir.1987), writ denied, 505 So.2d 57 and 505 So.2d 58 (La.1987). The issue in Gilbert was the same as the issue in the present case. This is evident from the following language in Gilbert:
"The principal issue in the U.M. carrier's appeal is whether the insured's election of $10,000 of UM coverage made several years prior to the accident automatically carried over when the policy was renewed several times at higher limits of liability and no additional elections or waivers were made by the insured with respect to the amount of U.M. coverage." 501 So.2d at 332.
The court in Gilbert held that when the insurer issued a policy with increased bodily injury limits to the insured, this constituted a separate contract and required an additional written rejection or selection of lower limits of uninsured motorist coverage limits. In so holding the court stated:
"In Courville v. State Farm Mut. Auto. Ins. Co., 393 So.2d 703 (La., 1981) the La. Supreme Court held that:
`... Since the initial insurance contract is limited to that six-month term, each subsequent renewal is a separate contract, even though a new policy is not involved.' At 705.
"In Sentilles v. State Farm Mut. Auto. Ins. Co., 443 So.2d 723 (La.App. 4th Cir.1983) this court, citing Courville, found that a previously executed election of U.M. coverage could not be `carried over' to new contracts `because the insured did not sign any additional selection forms applicable to the new policies.' At 727." 501 So.2d at 333.
Accordingly, in the instant case, even if the alleged selection of lower uninsured motorist limits by Mr. Pooler in the initial application for the Shelter policy was valid, an additional written rejection or selection of lower limits was required when the bodily injury limits were increased.
Additionally, when the bodily injury limits of a policy are increased, the insurer is agreeing to provide and the insured is agreeing to purchase additional bodily injury coverage not previously provided. If the original selection of lower limits of uninsured motorist coverage is presumed to remain in effect when the bodily injury limits of the policy are increased, this would result in a situation where an insured is found to reject additional uninsured motorist coverage before the opportunity exists to accept such additional coverage. We do not believe this was the intent of the legislature when it enacted La.R.S. 22:1406(D)(1)(a).
Accordingly, when the Shelter policy was issued to Mr. Pooler with bodily injury limits of $250,000/$500,000 and no written rejection of uninsured motorist coverage in that amount or selection of lower limits was made by Mr. Pooler, under La.R.S. 22:1406(D)(1)(a) that policy was issued with uninsured motorist limits of $250,000/$500,000.
For the foregoing reasons, we find this assignment of error to be without merit.
ASSIGNMENT OF ERROR NO. 1
By this assignment of error appellant asserts that the district court "erred in ruling on the merits prior to receiving and considering the supplemental deposition of Carroll E. Pooler, Jr. when the record had specifically been left open for that deposition." Appellant asserts that statements made in Mr. Pooler's supplemental deposition differ substantially from statements made in his original deposition, and thus have "a material bearing on the credibility of Mr. Pooler." Appellant then states that "[b]ecause this case essentially hinges on the credibility of the parties involved, it is *1256 respectfully submitted that the Trial Court committed manifest error in failing to consider the supplemental deposition of Carroll E. Pooler, Jr., the same deposition for which the record had been left open."
The decision to hold open or reopen a case for the production of additional evidence is within the sound discretion of the trial judge and his decision will not be disturbed on appeal unless it was a clear abuse of discretion. Richard v. Tarzetti, 510 So.2d 1361 (La.App. 3rd Cir.1987); Yeutter v. Lewis, 334 So.2d 728 (La.App. 3rd Cir.1976). Logically, this principle also controls with respect to a trial judge's decision to close a record which previously has been left open, as is the situation in the instant case.
The reason why the record was held open in the instant case is found in a stipulation in the record, in which the attorney for one of the plaintiff's stated as follows:
"Judge, I might mention on the record, as we discussed in chambers, we'd like to leave open the record for an additional deposition of Carroll Pooler, specifically to discuss the joint, the application labelled Joint 5 that we've just introduced. And I believe if in the event there is some testimony that is testified by Ricky Couvillion today that expands his deposition in any fashion, we would like to be able to go into that in an additional deposition. I believe that was all right with counsel."
The trial judge responded to the above stipulation by stating, "That's it."
With respect to the possible expansion of Ricky Couvillion's deposition by his trial testimony, appellant states in its brief, "It is respectfully submitted that the deposition testimony of Mr. Couvillion is entirely consistent with his trial testimony." Thus, even by appellant's own admission, there was no need to hold open the record for a supplemental deposition by Mr. Pooler regarding any expansion at trial of Mr. Couvillion's deposition testimony.
Further, the exhibit "Joint 5" referred to in the above quote is the application for the excess umbrella policy issued to Mr. Pooler by Standard. This exhibit was relevant to the issue of whether Mr. Pooler made a valid selection of uninsured motorist coverage limits lower than bodily injury limits with respect to the Standard policy. It was stipulated at trial that the signature on the application for the Standard policy was not Mr. Pooler's. Further, uncontradicted testimony at trial established that Mr. Pooler was being billed for uninsured motorist coverage with the same $1,000,000 limit as his bodily injury coverage under the Standard policy. Thus, the trial court had all the evidence it needed in order to rule on this issue and there was no need to hold open the record for a supplemental deposition by Mr. Pooler regarding "Joint 5."
Additionally, appellant asserts that this case "essentially hinges" on the credibility of the parties involved and that Mr. Pooler's supplemental deposition differed substantially from his original deposition such that it had "a material bearing on the credibility of Mr. Pooler" and, therefore, it was manifest error for the trial court to fail to consider the supplemental deposition before rendering judgment.
The trial court makes it clear in its Reasons for Judgment that the testimonies of Mr. Pooler and Mr. Couvillion were "conflicting and ambiguous" and that its judgment concerning the uninsured motorist coverage limits provided under the Shelter policy was based on something there was no conflict over -Mr. Couvillion's testimony concerning the increases in the bodily injury limits of the Shelter policy. Thus, this case does not, as appellant asserts, "essentially hinge" on the credibility of the parties, but rather, on the uncontradicted testimony of Mr. Couvillion, appellant's own agent. We find no abuse of discretion in the trial court's decision to close the record and render a judgment without considering Mr. Pooler's supplemental deposition.
For the foregoing reasons we find this assignment of error to be without merit.
ASSIGNMENTS OF ERROR NOS. 3 AND 4
A discussion of Assignments of Error Nos. 3 and 4 is unnecessary due to our *1257 decisions on Assignments of Error Nos. 1 and 2.
For the above and foregoing reasons the judgment of the trial court is affirmed. All costs of these appeals are to be assessed against appellant.
AFFIRMED.